PEOPLE *v.* CELLURA.

1. HOMICIDE—RES GESTÆ—SELF-DEFENSE—CONSPIRACY AS TO AC-CUSED.

In a prosecution for homicide the accused may prove the existence of a conspiracy to kill or assault him as part of the *res gestæ,* when there is an issue of self-defense.

2. SAME—AGGRESSOR—EVIDENCE OF CONSPIRACY.

A conspiracy involving the one slain to kill or assault one accused of the slaying, although unknown to defendant at the time of the homicide, would bear upon the question of who was the aggressor.

3. SAME—SELF-DEFENSE—CONSPIRACY.

Exclusion of conversations and statements showing a conspiracy on part of man slain to kill one accused of homicide, at time such evidence was offered, was not reversible error where there was then no issue of self-defense.

4. SAME—ORDER OF PROOF.

Ruling of court in prosecution for homicide that testimony of witness, hostile to the people, of conspiracy on part of one of the slain men to kill or assault accused would not be competent until defendant had taken the witness stand and offered something in his own defense *held*, not reversible error, the objection pertaining to the order of proof, especially where the prosecuting attorney interjected that such witness could be produced again when such testimony might be competent, and he was not thereafter called, and also where other evidence of the same nature was subsequently admitted (3 Comp. Laws 1929, § 17322).

5. SAME—ORDER OF PROOF—UNCOMMUNICATED THREATS—SELF-DEFENSE.

Exclusion of evidence of threats of deceased and companions which had not been communicated to one accused of homicide, which exclusion was limited only until after defendant had offered proof of self-defense, *held*, not reversible error where defendant's proffer was thereafter apparently abandoned.

6. SAME—EVIDENCE OF VIOLENT CHARACTER OF DECEASED.

Proof of the violent and turbulent character of deceased is admissible in homicide cases where there is an issue of self-defense, as bearing upon whether the deceased was likely to be the aggressor in such an encounter, but such proof must be confined to his general reputation as proof of specific acts is not admissible as evidence of deceased's violent character unless directly connected with and involved in the homicide.

7. SAME—INSTRUCTIONS—SELF-DEFENSE—AGGRESSION—EVIDENCE.

Instruction in prosecution for homicide permitting jury to find defendant was the aggressor in the affray *held*, justified by evidence showing that deceased and defendant were underworld or criminal characters and that latter had walked a considerable distance from where he first saw deceased to where shooting took place, had his hand in his pocket holding the gun and within a few seconds drew it and shot three men, and there is no evidence that they ever fired at him although there is some evidence that deceased were armed.

8. Same—Self-Defense—Instructions.

In prosecution for homicide in which accused claimed self-defense, charge to jury which, although not including various minutiæ of the claim of defense, did fully and sufficiently instruct jury as to defendant's theory and claim, together with the law applicable thereto, and emphasized the consideration of whether evidence led them to believe he was reasonably in fear of his life or serious injury even though he might have been mistaken.

9. Same—Cross-Examination—Harmless Error.

In prosecution for homicide committed by accused upon persons whom he claimed were about to abduct and extort money from him, remark of court that question by prosecuting attorney as to whether defendant was ever in the dope business, which was answered in the negative without objection raised, was upon cross-examination of defendant and that he didn't see anything wrong about it *held*, not error where defendant had previously testified he had engaged in illicit transportation of liquor, participated in its unlawful sale and in an illegal gambling business; nor was it prejudicial error to fail to give a particular request to charge, instructing the jury explicitly that they should disregard the question.

10. Same—Self-Defense—Order of Proof.

In prosecution for homicide, court's refusal to permit deputy chief of detectives to testify as to nature and victims of kidnappings in city where homicide occurred, as bearing upon defendant's state of mind, upon objection of prosecutor until after defendant had offered proof of self-defense, *held*, not reversible error, where, after introduction of proof of self-defense, defendant's counsel declined proffered return of such witness.

11. Same—Cross-Examination—Harmless Error.

Prosecutor's cross-examination of defendant in prosecution for homicide, relative to a specific case of kidnapping, after he had testified extensively concerning various kidnappings and murders of his friends and acquaintances, *held*, not prejudicial error, where no objection was made to the questions.

12. Same—Impeachment of People's Witness—Police Records of Deceased—Order of Proof.

In prosecution for homicide of men whom defendant claimed were of a violent character, wherein defendant sought to show such to be the case by way of introduction of police

records of the deceased upon cross-examination of a people's witness who had testified that an associate of the deceased men had told him their racket was extortion, exclusion of such records until after defendant had testified, *held,* not error, where records failed to impeach people's witness and impeachment was the only ground upon which they were admissible at that time.

13. SAME—IMPEACHMENT OF PEOPLE'S WITNESS—BREAKING AND ENTERING—EXTORTION—POLICE RECORDS.

Police records showing that a man had been arrested on suspicion of breaking and entering are no proof that he is not an extortioner, hence would not tend to impeach a people's witness in prosecution for homicide, who testified that an associate of the deceased men had informed witness that they were extortioners.

14. CRIMINAL LAW—IMPEACHMENT OF WITNESSES—PREVIOUS CONTRADICTORY STATEMENTS—CREDIBILITY—QUESTION FOR JURY.

Defendant in prosecution for homicide *held,* not prejudiced by fact that evidence of previous contradictory statements of a people's witness, an associate of the deceased, who proved to be a hostile witness and who admittedly changed his story, was not introduced; or failure of court to charge jury that they should not consider previous contradictory statements; or that questions relative to such statements were asked of and answered by the witness, since such questions and answers had a bearing on the credibility of the witness, a matter left for the jury.

15. HOMICIDE—SELF-DEFENSE—AFFIDAVITS.

Examination of witness and rulings made thereon in prosecution for homicide relative to an affidavit previously made by him *held,* not prejudicial to defendant where statements in affidavit related principally to the question of whether defendant shot the deceased and who was present at the time and under the evidence of self-defense the shooting was admitted.

16. SAME—STATEMENTS BY DEFENDANT ON ARREST—DELAY—VOLUNTARY SURRENDER—INSTRUCTIONS.

Instruction, given in prosecution for homicide, in accordance with defendant's request to charge that statements made by a defendant at the time of the arrest should be received with great caution and detailing reasons therefor to which court added "if his arrest is close to the time of the alleged offense"

*held,* not reversible error, where defendant was at liberty about six years prior to voluntary surrender, had advice of attorney, knew what his defense was going to be, was a witness in his own defense, and had opportunity, but did not attempt, to explain any contradictory statement.

17. INDICTMENT AND INFORMATION—HOMICIDE—HARMLESS ERROR.
Refusal of court to strike ''Alias Black Leo,'' added after defendant's name, from indictment before trial in prosecution for homicide *held,* not reversible error nor prejudicial to defendant where only reference to such words was made in prosecutor's reading of indictment in the opening statement and words were stricken at the close of the people's case.

18. CRIMINAL LAW—HOMICIDE—MISTRIAL—PREJUDICE.
Record in prosecution for homicide *held,* not to show unfairness or prejudice on the part of the trial judge as to defendant where, after court had declared a mistrial for prejudicial remarks theretofore made, he appears to have been assiduous to a marked degree to insure every protection of a fair trial to defendant.

Appeal from Recorder's Court for the City of Detroit; Gordon (Arthur E.), J. Submitted January 12, 1939. (Docket No. 93, Calendar No. 39,774.) Decided March 9, 1939. Rehearing denied April 25, 1939.

Leo Cellura was convicted of murder. Affirmed.

*George A. Kelly* and *Edward H. Kennedy,* for appellant.

*Thomas Read,* Attorney General, *Duncan C. McCrea,* Prosecuting Attorney, and *William L. Brunner, John A. Ricca,* and *Nicholas J. Wagener,* Assistant Prosecuting Attorneys, for the people.

McALLISTER, J. Leo Cellura was indicted jointly with Theodore Pizzino and Angelo Livecchi for the murder of William Cannon on July 3, 1930. Pizzino and Livecchi were arrested, tried, and convicted on

June 27, 1931. Cellura escaped from the scene of the crime, concealed himself, and remained a fugitive from justice for nearly six years, until June 28, 1936, when he surrendered to the police. On June 4, 1937, he was convicted by a jury of the crime of murder in the first degree, from which conviction he appeals.

For some years prior to the repeal of the prohibition laws, Leo Cellura had engaged in the transportation of illicit liquors from Canada across the Detroit river to Ecorse. At various times, he had been the part owner of a night club, restaurant, and cabaret, engaged in the unlawful sale of liquor in Detroit and Hamtramck. After prohibition and prior to the day of the homicides, he continued as an operator of a night club and a gambling establishment.

On July 3, 1930, about five o'clock in the afternoon, as Cellura was approaching the entrance of the LaSalle hotel in Detroit, an automobile had drawn up to the curb in front of the hotel entrance. Cellura approached the automobile, and after an exchange of words, drew a gun from his pocket and shot several times through the window at the three occupants of the car. Cannon and a man named Collins, sitting in the front seat with him, were killed. Mike Stitzel, who was sitting in the back seat, was shot several times, but was later removed to a hospital where he eventually recovered from the gunshot wounds.

Cannon and Collins were criminals. They had a long record of arrests for armed robbery, but they were discharged without trial. Eleven years before, Cannon had served a penitentiary sentence for the crime of breaking and entering in the nighttime. They made a business of extortion. Stitzel was their accomplice. Their principal practice seems to have

been to send Stitzel out to entrap moral degenerates into incriminating situations, and then for Cannon and Collins to appear wearing badges of police officers and to extort money from them—to "shake them down"—by threats of arrest. They had agents in various towns who would communicate with them by telephone whenever any new victims were available.

Cellura lived in the underworld. Among his associates were shady characters and criminals. His friends, engaged in illegal and criminal ventures, were often themselves the victims of kidnapping and extortion by other criminals. One of his partners in the liquor business had been murdered. Cellura always went armed, having secured a legal permit to carry a pistol for protection against highwaymen, kidnappers, and killers.

On the trial he testified in his own defense. He had been told, he said, on numerous occasions by various persons several days before the killings that there were two men looking for him. He claimed that he had been advised by the superintendent of police of the city of Detroit, among others, that there was a plot on the part of certain criminals to abduct him, or in the argot of the underworld, "to take him for a ride." On the day before the killings, he claims to have been told by a doorman that there were two men looking for him and that they had a car with a license plate from the State of Illinois. It is the claim of defendant Cellura that as he was approaching the LaSalle hotel he was being followed by three men; that they turned and got into a parked automobile with an Illinois license plate; that they then called to him to come over; that in answer to their call he approached the car and was asked to get inside. He says that he told them that if they

wanted to see him they could do so in his room in the hotel. He then claims that one of the men referred to him by a vile name and told the other to "cover" him while he forced Cellura into the car; that the two men, Cannon and Collins, sitting in the front seat were armed; that they reached for their pockets where they carried their guns; whereupon defendant, who had approached the car with his right hand in his pocket and believing that they were about to shoot or kidnap him, drew a pistol and fired several times into the car, in self-defense.

Defendant testified that he then escaped from the scene of the killings, and that on the advice of counsel he did not surrender for six years. His previous counsel testified in support of this statement, to the effect that after the killings he was consulted by Cellura; and that he had subsequently discussed the case with the superintendent of police and the prosecuting attorney; that he felt that Cellura could not secure a fair trial at the time, because of public hysteria existing as the result of the killing of Jerry Buckley, who had been murdered in the lobby of the same hotel shortly after the killing of Cannon and Collins, and because of other gangster killings; and that his discussions with the police and the prosecutor were concerned with the circumstances under which Cellura would surrender.

The people claim that the defendant was not in fear of his life, that he did not kill in self-defense, and that he is guilty of premeditated, cold-blooded murder.

Error is assigned on the refusal of the court to permit defendant to introduce evidence of the alleged acts of deceased and his so-called accomplices which bore directly upon their intentions toward defendant. It is claimed that defendant had the right

to show certain conversations and statements to prove a plan on the part of deceased to extort money from him, or to abduct and kidnap him. It is admitted that defendant had no knowledge of such plans or conversations, but it is contended that they are part of the *res gestæ*, and that they are competent as proving conspiracy and tending to show which party was the aggressor at the time the homicides occurred.

The claimed error arose on the ruling of the court as to what the deceased Cannon had told Collins about a certain incident in Florida. Stitzel, a hostile witness for the people, on cross-examination by defendant's counsel, stated that Cannon on the day of the homicides had said that he "was in a hole, that he needed $5,000; that he was in trouble * * * in Miami, Florida."

Upon further questioning as to what Cannon said about the $5,000, the prosecuting attorney objected on the ground that it was hearsay. At this time Cellura had not testified on his claim of self-defense. The court ruled that the statement and conversations of Cannon were incompetent, and in passing upon the question said:

"*The Court:* It would be excluded until some other situation arises that might possibly make it competent. I say it is not competent now. That will leave the door open in case it becomes competent."

At this point, the prosecuting attorney interjected the following statement:

"If after their defendant takes the stand, it in any way becomes competent, after any other defense witness takes the stand, in case that may be competent, this witness is in Detroit and can be produced again."

"*The Court:* That is what I had in mind * * *
We will go ahead until Cellura takes the stand and
offers something in his own defense."

Cellura afterward testified in his own defense, but
no further offer of proof of the statements or con-
versations of Cannon was made after defendant's
testimony.

In a homicide case, the accused may prove the
existence of a conspiracy to kill or assault him as
part of the *res gestæ,* when there is an issue of self-
defense. Such a conspiracy, although unknown to
defendant at the time of the homicide, would bear
upon the question of who was the aggressor. Under-
hill's Criminal Evidence (3d Ed.), p. 726; *Wilson* v.
*People,* 94 Ill. 299.

The court, however, did not rule that the defend-
ant could not introduce such evidence, but left the
door open to present such testimony after proof of
self-defense was offered. If there were no issue of
self-defense, such evidence would be incompetent.
In the natural order of proof, therefore, proof of
such conversations and statements showing a con-
spiracy would follow defendant's claim of self-
defense. The ruling of the court as to the order of
proof cannot, therefore, be urged as reversible
error. *People* v. *Walters,* 223 Mich. 676; 3 Comp.
Laws 1929, § 17322 (Stat. Ann. § 28.1052).

Notwithstanding this limitation on the introduc-
tion of such evidence, the trial court permitted Stit-
zel to testify with regard to the Florida incident
that Cannon had told Collins that he had been
arrested there for blackmail; that he needed $5,000
to get clear of the case; and that "if them dagoes
think they are tough, well, I will show them how
tough I am." All of such testimony to the advan-

tage of defendant might have been excluded under the ruling made by the court.

It is further claimed that the court erred in excluding from evidence threats of deceased and his companions which were not communicated to defendant. It is contended that threats, even though uncommunicated, are properly admissible as bearing on who the aggressor was; and such is the rule. *Brownell* v. *People,* 38 Mich. 732; *People* v. *Cook,* 39 Mich. 236 (33 Am. Rep. 380); *People* v. *Harris,* 95 Mich. 87; *People* v. *Palmer,* 96 Mich. 580, 30 C. J. p. 230. But the court only limited the exclusion of such evidence until after defendant had offered proof of self-defense, and such offer of defendant was thereafter apparently abandoned.

Defendant argues that it was reversible error for the court to refuse to permit evidence of other specific acts of violence on the part of deceased as bearing upon his violent character. Proof of the violent and turbulent character of deceased is admissible in homicide cases where there is an issue of self-defense, as bearing upon whether the deceased was likely to be the aggressor in such an encounter. Proof of specific acts is not, however, admissible as evidence of violent character in such a case. Evidence of the character of deceased must be confined to his general reputation, and evidence of particular acts of violence or lawlessness is not admissible unless they were directly connected with and involved in the homicide.

In *State* v. *Thompson,* 49 Ore. 46 (88 Pac. 583, 124 Am. St. Rep. 1015), in passing upon this proposition, the court said:

"There was evidence, as the bill of exceptions states, tending to show that the defendant acted in self-defense, and in such case proof that the de-

ceased was a violent and dangerous man is compe-
tent, whether known to the defendant or not, for the
purpose of aiding the jury in determining who was
in fact the aggressor, and the nature and character
of the assault, if one was made by the deceased.
For, as said by Mr. Wigmore: 'One's persuasion
will be more or less affected by the character of the
deceased; it may throw much light on the probabili-
ties of the deceased's action.' 1 Wigmore, Evidence,
§ 63.  To prove the dangerous and desperate char-
acter of a deceased, of course, does not tend to prove
the commission of an unlawful act by him, but it
does increase the probability of the other evidence
tending to show that he commenced the affray, and
that his attack was felonious and intended to do the
defendant great bodily harm.  The claim that the
defendant acted in self-defense, if indicated by the
other evidence, would be more readily believed con-
cerning a violent and dangerous man than a peace-
able and quiet one, and any mind searching for the
truth and in doubt would naturally be affected by
such evidence.  The defendant's knowledge or want
of knowledge of the deceased's character can have
nothing to do with its value as evidence for the pur-
pose stated.''

In *King* v. *State*, 65 Miss. 576, 582 (5 South. 97,
7 Am. St. Rep. 681), a homicide case in which the
plea was self-defense, the court said:

''The character of the deceased could not be
shown by particular acts of misconduct on his part
in no way connected with the accused.  That could
only be proved by evidence of his general reputation.
1 Bishop  Criminal  Procedure,  § 1117;  2  Bishop
Criminal Procedure, § 617.''

In *Dupree* v. *State*, 33 Ala. 380, 388 (73 Am. Dec.
422), where defendant offered evidence that de-
ceased had been imprisoned in a penitentiary from

which he had escaped, as bearing upon his character, the court said:

"So, also, the proof that the deceased was a convict, escaped from the Georgia penitentiary, was inadmissible. Particular acts of misconduct on the part of the deceased, and offenses against the law committed by him, and not connected with this case, were inadmissible. For a still stronger reason, parol evidence of his having been a penitentiary convict was inadmissible. It is not allowable to go into proof of particular acts, unconnected with the case, to show the character of the deceased. *Nugent* v. *State,* 18 Ala. 521; *Pritchett* v. *State,* 22 Ala. 39 (58 Am. Dec. 250); *Franklin* v. *State,* 29 Ala. 14."

In *State* v. *Dill,* 48 S. C. 249, 256 (26 S. E. 567), where it had been proved that deceased had killed another man, defendant on a plea of self-defense offered in evidence proof of the indictment of deceased for such homicide, as proof of his violent and dangerous character, and in affirming the ruling of the trial court in excluding such proof, the court said:

"Exceptions 5, 6, 7, and 8 are considered by the appellant as raising the single question as to the right of the defendant to offer in evidence a bill of indictment against the deceased, John D. Kirby, for the murder of one Hammett. The defendant and his witnesses had been allowed to state as a fact that John D. Kirby had killed Hammett, in order to show that the defendant knew Kirby was of a violent, dangerous character, and, besides, that Kirby had the character, while alive, of being a dangerous man. The defense, not content with this latitude, insisted that this indictment should also be introduced. What would have been the practical effect of such a ruling, if it had been made by the circuit judge? There

would have been thrust upon the attention of this jury, charged as they were with the trial of Dill for the murder of Kirby, an indictment of Kirby for the murder of Hammett. Under such circumstances the solicitor might have demanded the privilege or right to show by evidence that Kirby was not guilty of the murder of Hammett. Such a contingency has but to be stated to show how untenable is the contention of the defense in the case at bar.''

In *Jett* v. *State,* 151 Ark. 439, 443 (236 S. W. 621), where defendant in a homicide case offered proof as evidence of violent and dangerous character that deceased had been sentenced to prison on a charge of armed robbery, the supreme court of Arkansas, in affirming the action of the trial court in ruling such evidence inadmissible, said:

''Appellant was permitted to offer testimony to the effect that Gibson bore the reputation of being a quarrelsome, turbulent, and dangerous man. But the court refused to permit him to offer in evidence an authenticated copy of the judgment of a circuit court in Missouri sentencing Gibson to the penitentiary upon a plea of guilty to a charge of robbery. Error is also assigned in giving and in refusing to give certain instructions.

''No error was committed in refusing to admit the excluded record of Gibson's plea of guilty. Inasmuch as appellant pleaded self-defense, it was competent for him to show Gibson's general reputation for peace and quietude as a circumstance to be considered by the jury in determining who was the aggressor in the fatal encounter. But the testimony was properly limited to proof of general reputation. It is not competent in such cases to prove specific acts of violence or bad conduct. *Hardgraves* v. *State,* 88 Ark. 261 (114 S. W. 216); *Coulter* v. *State,* 100 Ark. 561 (140 S. W. 719); *Campbell* v. *State,* 38

Ark. 498; *Palmore* v. *State*, 29 Ark. 248; *Carter* v. *State,* 108 Ark. 124 (156 S. W. 443) ; *Trotter* v. *State,* 148 Ark. 466 (231 S. W. 177)."

Defendant offered no evidence of general reputation of deceased for violent character, but contended that he had the right to offer evidence of numerous arrests and a plea of guilty to a charge of breaking and entering in the nighttime on which Cannon was sentenced to prison for one year in the month of March, 1919, 11 years prior to the homicide. The blackmailing case in Florida had been already testified to by Stitzel. Under the law, the proof of specific acts, of arrests, and of other unlawful conduct was incompetent to show that deceased was a man of violent and turbulent character. See notes in 4 Ann. Cas. 338; 11 Ann. Cas. 229; 124 Am. St. Rep. 1023; 2 L. R. A. (N. S.) 102; 3 L. R. A. (N. S.) 361; 14 L. R. A. (N. S.) 713; 64 A. L. R. 1029.

As further ground for reversal, defendant claims that he was entitled to have the jury instructed in accordance with a certain specific request to charge relating to the law of self-defense. It is contended that the instruction given in lieu thereof was erroneous because, it is said, there was absolutely no evidence that defendant was the aggressor. Although defendant himself testified that the deceased was the aggressor, nevertheless there was certainly evidence from which the jury could find that defendant was the aggressor. He walked a considerable distance, from the place where he first saw the occupants of the car, toward the automobile. He had his hand in his pocket, holding the gun. Within a few seconds, he had drawn the gun, shooting the three men. There was no evidence that they had ever fired at defendant. Although Stitzel testified that Cannon and Collins had guns, and another witness told of seeing

a gun near one of the bodies afterward, neither the police, nor anyone else, so far as appears from the record, saw any guns or found any weapons belonging to the slain men. The instruction relating to self-defense was not erroneous.

Complaint is also made that the court erred in not submitting to the jury the full theory and claim of defendant. A review of the charge shows that while the court did not include various minutiæ of the claim of defense, consisting of a detailed review of defendant's testimony in all particulars regarding circumstances upon which he based his belief that he was to be abducted, the court fully and sufficiently instructed the jury as to defendant's theory and claim, together with the law applicable thereto, and emphasized the consideration of whether they believed from the evidence that defendant was reasonably in fear of his life or serious injury even though he might have been mistaken.

On cross-examination of defendant, the prosecutor asked:

"*Q.* Were you ever in the dope business?"

"*A.* No, sir." * * *

"*Mr. Kennedy:* Now, that dope, your Honor, I think in my opinion and in the opinion of most people, it is the lowest and most prejudicial thing you can put against a man * * * now they haven't got any proof."

"*The Court:* I don't know that they have or not. This is cross-examination. I don't see anything wrong."

Error is assigned on the above statement of the court. It will be observed that no objection was made to the question, that it was answered, and that no motion to strike was made. Defendant had previously testified that he had engaged in illicit trans-

portation of liquor to Detroit from Canada, that he participated in the unlawful sale of liquor, and in an illegal gambling business. The "dope business" was not referred to or mentioned by the prosecutor thereafter. The statement of the court was not erroneous, nor was it reversible error for the court to fail to give a particular request to charge, instructing the jury explicitly, that they should not allow the asking of this question by the prosecutor to prejudice their minds.

Counsel for defendant claims that the refusal of the court to permit deputy chief of detectives, Navarre, to testify as to the nature and victims of kidnappings in Detroit from 1926 to 1930 was prejudicial to defendant. It was sought to show such facts as bearing upon defendant's state of mind at the time of the homicides. The prosecutor objected to questions directed to this end, on the ground that Cellura had not yet testified, and contended, in effect, that such testimony would not be admissible until Cellura offered proof of self-defense. The court sustained the objection. Later, at the close of the case, the court asked counsel for defendant if they desired to have Navarre brought back for further testimony. Counsel declined to avail themselves of such evidence. There was no error in the ruling of which complaint is made.

Defendant, after himself testifying extensively concerning the kidnappings and murders of his friends and acquaintances and his advice to them regarding threats which they had received, was asked on cross-examination whether he had ever done "anything for anybody who was threatened with being kidnapped." Objection was made to the question as immaterial. The prosecutor then reframed his question asking whether defendant had ever

helped anyone who had been kidnapped. Without objection, defendant answered affirmatively and testified:

"*Q.* What did you do?"
"*A.* Do you remember that Thompson baby?"
"*Q.* Yes, very well, what did you do about the Thompson baby?"
"*A.* Mr. Harry Bennett, a close friend of mine at the Ford Motor Company, he told me if I could help find that baby. I looked all over. I try to help. I did not find him, somebody else did. This Legs Laman gang didn't have the baby. I don't know if the actual kidnapper of the Thompson baby is serving time or if it was somebody else who did it."

Contrary to counsel's contention, such examination, in view of defendant's previous testimony and the fact that no objection was made to the questions, was not prejudicial to defendant.

Detective O'Day, on cross-examination by defendant's counsel, testified that Stitzel had told him that the racket of Cannon and Collins was extortion; that O'Day believed Stitzel; and that he had to take Stitzel's word, "for what it was worth," about the matter. He was then asked whether he had nothing more than Stitzel's word to show what the racket was. O'Day answered that that was the only thing he had. On being questioned as to whether he had looked up the records of Cannon and Collins, and on his answer in the affirmative, he was asked if there was any place where the police records corresponded to what Stitzel had said about the racket. He could not recall if such was the case. Counsel for defendant then asked whether the witness could refresh his recollection by looking at the records, and upon being told that he could, counsel stated that he wished to show the witness the records in question, and that

if the witness read them they would be introduced in evidence. The prosecutor objected on the ground that this was an attempt to show the character of accused, which was emphatically admitted by defendant's counsel. It was agreed that the only question was as to whether the records were admissible for the purpose of impeaching the witness, O'Day. The court sustained the objection, holding that such records could not be used to refresh the recollection of the witness, stating, however, that after defendant testified the whole matter might be thrown open. Defendant's theory was that Cannon and Collins were men of violent character; and counsel's intention was to introduce the police records of the men after O'Day had referred to them to refresh his recollection. The records, according to the theory of the defense, would show deceased to have been a vicious criminal of violent propensities, instead of merely an extortioner. If there was proof of such violent character, it would have a bearing on who the aggressor was at the time of the killing. But the records were inadmissible. In the first place, they could not impeach O'Day in this manner, for the records themselves would not establish that he had testified falsely or contradicted himself. O'Day stated that he could not recall whether the records corresponded to what Stitzel told him. Whether they corresponded or not would not affect his testimony as to what he believed the racket to be. The records did not show anything about the so-called racket, and the record of arrests did not indicate whether Stitzel's account to O'Day was false, or that O'Day's belief therein was unjustified. The fact that a man has been arrested on suspicion of breaking and entering is no proof that he is not an extortioner; and such a record in the hands of O'Day would not, in

itself, lead him to disbelieve what Stitzel told him. There was no implication, nor could any inference be drawn that, because deceased had been arrested for robbery or breaking and entering, he was not in fact an extortioner. The records could be admissible only to impeach O'Day. They did not have this effect, and the ruling of the court excluding them was not error.

On the examination of Stitzel by the prosecutor, he proved to be a hostile witness. He was interrogated as to certain statements he had previously made. For the most part, he testified he could not remember making such statements, and that, if he had done so, they were false. Although such statements might have been introduced in evidence to impeach the witness, no attempt was made to do so. The court refused to strike out the questions asked the witness, and his answers thereto, with reference to whether he had made previous contradictory statements. It was admitted by counsel for defendant that the witness had changed his story. The fact that such contradictory statements were not offered in evidence to impeach the witness was to the advantage of defendant, and the failure of the court to charge the jury that they should not consider previous contradictory statements of the witness was unnecessary. No such statements were in evidence. The questions asked and answered had a bearing on the credibility of the witness, and the court left it to the jury to say whether the witness had been impeached.

A further question is raised regarding the interrogation of a certain witness upon an affidavit previously made by him. The statements in such affidavit related principally to the question of whether Cellura shot the deceased and who was present at the

time. Under the evidence of self-defense, the shooting was admitted. No part of the examination of such witness or rulings thereon was of a nature prejudicial to defendant.

Defendant requested the court to charge:

"Some evidence has been offered of a statement made by the defendant at the time of his arrest, and I charge you in relation thereto, that statements at the time of the arrest of a defendant are to be received with great caution; for besides the danger of misapprehension of the witness of the misuse of words, the failure of the party to express his own meaning, the infirmity of memory, and the danger of the witness relating the statement and placing the wrong construction or obtaining an improper conclusion from the words of the defendant, it should be recollected that the mind of the prisoner himself is often oppressed by the calamity of his situation, and he is often influenced by motives of hope or fear to make statements."

The court gave the instruction as requested, adding, however, at the conclusion thereof: "if his arrest is close to the time of the alleged offense." This addition is claimed to have resulted in reversible error. The defendant after escaping from the scene of the crime was at liberty for six years after the homicide. During that time, he advised with an attorney, and various witnesses on his behalf consulted with his previous counsel. His arrest was due to a voluntary surrender. He had plenty of time to think the matter over. He knew what his defense was going to be. He had the previous benefit of legal advice. And after he had made the statements in question, he was a witness in his own defense. He had the opportunity of explaining any contradictory statement. He could have explained

whether he had failed to express his real meaning, or had been influenced by motives of fear or hope. But in his testimony he did not attempt to explain nor did he mention such previous statements. Under the circumstances of this case, the instruction as given cannot be said to be reversible error.

When defendant was indicted, there was included in addition to his name in the indictment, "Alias Black Leo." Prior to trial a motion to strike such alias was made, and denied. A similar motion was later made at the close of the case for the people, and was granted by the court. Error is alleged for refusal to strike on the first motion, and it is claimed that because such alias was derogatory, defendant was prejudiced before the jury. No reference was ever made to the alias, except by the prosecutor in reading the indictment in the opening statement to the jury. The alias was included in the indictment by the grand jury six years previous to the trial. We are of opinion that no prejudice resulted therefrom to defendant and that there was no error in refusing to strike the same until the close of the case for the people.

Charges that the trial judge was prejudiced are not sustained by the record. When the case was first being tried, the trial judge granted a motion by defendant for a mistrial. Various remarks had been indulged in by counsel after certain rulings of the court had been made. The court objected to repetitious attempts to secure the introduction of evidence by indirection, and during a reprimand to defendant's counsel, said:

"The attempts by counsel for either side, when there are any, to get in testimony by indirection, after that particular style of testimony, particular matter or point in issue has been ruled out as im-

proper,—those attempts are improper, and the gentlemen on both sides of the table know it, and they are both competent attorneys—all of the attorneys."

Upon this statement by the court, defendant's counsel moved for a mistrial on the ground of highly prejudicial remarks of the court. In granting the motion, the court stated that he gave counsel for defendant credit for good faith in the manner of conducting the case. It is most questionable whether defendant was entitled to a mistrial; and it is impossible to draw any conclusion of prejudice from this incident.

On the subsequent trial, the court appears to have been assiduous to a marked degree to insure every protection of a fair trial to defendant. After counsel for defendant rested, the court called attention to numerous questions from his notes concerning rulings that had been made relative to the exclusion of evidence until after defendant had testified. The court also asked defense counsel whether they wished to have any previous witnesses recalled, naming such witnesses, and expressed his willingness to give time for additional search and citation of authorities in the various matters in which rulings had been made. There is no claim that the alleged prejudice is of a nature undisclosed by the record, and from the record there is nothing to show unfairness or prejudice on the part of the trial judge.

There were many close and perplexing propositions before the court during the trial. The question of evidence of the violent character of deceased arose on multitudinous occasions, unexpectedly, from different angles, in various forms, requiring rulings according to the circumstances on different

principles of law; for purposes of impeachment; as tending to show who was the aggressor; and for the purpose of showing the state of mind of the defendant, as justifying his apprehension of peril; and as to the order of proof.

The case was tried for more than four weeks before a jury; it was vigorously and ably prosecuted by the people; it was defended by distinguished and adroit counsel with the utmost of tenacity, vigor, and high sense of duty. Everything possible was done and every point battled to insure a fair trial for defendant and the full protection of his rights. The ultimate question was for the jury. They found the defendant guilty of murder. There was no reversible error on the trial.

Judgment affirmed.

BUTZEL, C. J., and SHARPE, POTTER, and CHANDLER, JJ., concurred with MCALLISTER, J.

WIEST, J. (*concurring*). Under elementary law, repeatedly announced by this court, I find no reversible error and, therefore, concur in the result.

BUSHNELL, J., concurred with WIEST, J. NORTH, J., took no part in this decision.