PEOPLE v. STALLWORTH.

1. HOMICIDE—EVIDENCE—CAUSE OF DEATH.
    Evidence presented in prosecution of widow of deceased for his murder *held,* to justify jury's belief that defendant knew she had inflicted the fatal wound rather than that the victim may have wounded himself by falling on his own knife.

2. SAME—BURDEN OF PROOF TO NEGATIVE SELF-DEFENSE.
    The burden of proof to exclude the possibility that the killing was done in self-defense rests on the prosecution, where self-defense is interposed in prosecution for murder.

REFERENCES FOR POINTS IN HEADNOTES
[1, 4] 26 Am Jur, Homicide § 455 *et seq.*
[2] 26 Am Jur, Homicide § 289.
[3] 26 Am Jur, Homicide § 149 *et seq.*
[5, 6] 26 Am Jur, Homicide § 344.
    Admissibility of evidence as to other's character or reputation for turbulence on question of self-defense by one charged with assault or homicide. 64 ALR 1029.

3. SAME—SELF-DEFENSE—RETREAT—HOME.

Self-defense in a prosecution for murder requires a showing that the defendant had done all which is reasonably in his power to avoid the necessity of extreme resistance, by retreating where retreat is safe, but a man is not obliged to retreat if assaulted in his own dwelling.

4. SAME—MANSLAUGHTER—VERDICT—GREAT WEIGHT OF EVIDENCE.

Evidence presented on record of prosecution of defendant widow of deceased for his murder *held*, not to show claimed error in that jury's verdict of manslaughter was against the great weight of the evidence.

5. SAME—SELF-DEFENSE—REPUTATION OF DECEASED FOR VIOLENCE—EVIDENCE.

Testimony of deceased's reputation for violence is admissible in prosecution for his murder, where defendant interposes defense of self-defense, since such testimony is at least circumstantial evidence of defendant's state of mind and defendant's belief in an impending attack by deceased and is relevant in determining who is the aggressor.

6. SAME—SELF-DEFENSE—WITNESSES AS TO DECEASED'S CHARACTER FOR VIOLENCE.

It was reversible error to exclude the testimony of defendant's witnesses as to the character of her deceased husband for violence in prosecution for murder in which she interposed defense of self-defense, where such proffered testimony was in substantiation to her own testimony, as such directly affected the question of defendant's guilt and might have affected the result.

Appeal from Calhoun; Hatch (Blaine W.), J. Submitted June 8, 1961. (Docket No. 45, Calendar No. 48,716.) Decided November 30, 1961.

Patricia Irene Stallworth was convicted of manslaughter. Reversed and remanded.

*Paul L. Adams,* Attorney General, *Joseph B. Bilitzke,* Solicitor General, *Noble O. Moore,* Prosecuting Attorney, for the people.

*Owen Dudley,* for defendant.

Edwards, J. In the last of a series of drunken attacks upon his wife, George Stallworth suffered a knife wound in the lower abdomen. Four days later, on July 30, 1959, he died from the effects of the knife wound. His wife was charged with his murder.

After trial before a jury in Calhoun circuit court where she pleaded self-defense, the wife, Patricia Stallworth, was found guilty of manslaughter and was sentenced to the Detroit house of correction for 10 to 15 years. The circuit judge heard and denied a motion for a new trial.

On appeal to this Court, appellant claims error in the denial of the motion for new trial. She asserts that the jury verdict was against the great weight of the evidence, and that certain testimony bearing on her husband's reputation for violence was erroneously excluded.

Some recital of the events preceding George Stallworth's death are essential to our deciding the case.

George and Patricia Stallworth were man and wife—Patricia Stallworth was 19 years old and George was 26. Patricia had a young daughter by a previous marriage who lived with them in Albion, Michigan.

On the afternoon of July 25th, the day before he was wounded, George Stallworth had been drinking. At his mother's home a verbal altercation between the couple ended with George assaulting Patricia by bending her over a fence and choking her. Stallworth's mother succeeded in getting him to desist. After this affair, Patricia Stallworth armed herself with George's knife and carried it with her. A neighbor, Margie Alexander, with whom she left her daughter for that night, testified that she saw the knife and cautioned her. To this, Mrs. Stallworth replied, "If he messes with me, I'm going to kill him."

Subsequently on that same evening, the Stallworths were at a place called the Sportsman's Club, in Albion. Here Patricia asked him for some money and George replied by threatening to knock her through the window. They left the Sportsman's Club and went to the Oak Grove Country Club outside of Jackson. At this club, George Stallworth struck Patricia and was asked to stop by an officer of the club.

The couple left the club and as Patricia was about to get into a car George knocked her down, blacking her eye, and then threw her on the ground and sat on her, beating her with his fists. Patricia got the knife out of her purse and opened it, whereupon George grabbed that wrist. Eventually, a bystander took the knife away and gave it to George who got up and departed.

Patricia was taken home by bystanders and shortly after her arrival there George arrived.

It appears that by this time it was in the vicinity of 6 a.m. on Sunday morning. The next altercation (which in the end proved to be the fatal one) then started, with George telling his wife to get out, that he was all through with her, and with her answering that she wouldn't—that it was as much her home as his. George then threatened to and started to throw her out, when she grabbed a paring knife from the kitchen table.

Mrs. Stallworth's version at the trial of what happened next follows:

"*A.* Well, as I said yesterday, I got my left hand behind me on the door knob, and I got the door open once and he taken his foot and kicked it shut, and at that time he had ahold of my right hand with his left hand, and his—the right side of his body was pressed against me—on my left side. And his head was right up about here. So that made my head—my vision slant towards that way. And as I remember, his

left—the left side of his body was not—within close range of me and at that time I remember thrusting my hand forward. But as I thrust it forward, I didn't feel any pressure on the knife. At the time he swung around, he had the back of his body completely up against me, and he still had ahold of my right arm. At that time he had my right arm with both of his hands and he was twisting my wrist trying to get the knife out of my hand. * * *

"*A.* As I said, after I had thrusted the knife at him, I don't remember feeling any pressure on the knife whatsoever. He swung the back part of his body around up against me, and he had both of his hands around my wrist twisting, trying to get the knife. I remember him saying—he never made the statement I cut him—I remember him saying I cut at him, and he said he was going to kill me."

The version upon which the prosecutor relies principally is that of a neighbor who lived in an adjoining apartment. Margie Alexander testified:

"*A.* And he said to her, 'Pat, you get out.'

"*Q.* He says to Pat what?

"*A.* She getting out.

"*Q.* She getting out or you're getting out?

"*A.* Pat, you're getting out.

"*Q.* Then what happened?

"*A.* I heard footsteps back and forth upstairs. When he come back down I could hear footsteps down and he said—she said to George—she said, 'You have hit me once before, you have blackened my eye and don't you hit me again.' A few minutes I heard her scream. She cried. She said, 'You hit me again.' He said, 'Pat, you get out.' Then I heard tussling. * * *

"*Q.* Then what did you hear?

"*A.* Then I heard them coming out the door—tussling out the door. * * *

"*Q.* What did you do?

"*A.* I stood up and looked out the window after I heard them coming out the door.

"*Q.* Tell the ladies and gentlemen of the jury what you saw out the window.

"*A.* Well, I saw Pat and George out there. He was pushing her with his arms up around her—pushing her, telling her to get out—to get out now, Pat, get out now. She said, 'Turn me loose.' She was pushing his hand away and she let her hand down and he got away—walked away from her—walked back from her door, and she came a long step to my door and they were looking at each other real funny.
\*   \*   \*

"*Q.* (By Mr. Moore continuing): Now Mrs. Alexander—

"*A.* Yes.

"*Q.* Could you see the hands of George Stallworth?

"*A.* Yes, I could.

"*Q.* Did he have anything in his hand?

"*A.* No, I didn't see anything again.

"*Q.* If he had of had, would you have seen it?

"*A.* I couldn't see it once. Yes, I could, the way he had his hand. He had his hands open. I could have seen it, yes.

"*Q.* If he had anything, you could have seen it?

"*A.* I could have seen it.     .

"*Q.* Did you see the hand of Pat Stallworth?

"*A.* Yes, I did.

"*Q.* What did she have in her hand, if anything?

"*A.* She had a knife in her hand.

"*Q.* She had a knife?

"*A.* Yes, she did.

"*Q.* Could you tell from where you were what kind of a knife that was?

"*A.* No, sir, I couldn't.  \*  \*  \*

"*A.* He had his hands just like this on him—on her. Get out, Pat. He was pushing her, telling her to get out.

"*Q.* Now take the stand again. Where were they at that time?

"*A.* Out there at the end of the sidewalk on the grass.

"*Q.* At the end of the sidewalk by the grass?

"*A.* Yes.   *   *   *

"*Q.* All right. Now when Mr. Stallworth—you said Mrs. Stallworth had this knife, is that right?

"*A.* Yes.

"*Q.* And she brought her hands down?

"*A.* She let her hand go.

"*Q.* What did Mr. Stallworth do when she brought her hand down?

"*A.* He turned her loose and walked towards his door.

"*Q.* All right. Now then what happened after that?

"*A.* She walked towards my door.

"*Q.* All right, then what happened?

"*A.* She knocked on my door and I turned to come downstairs. As I got middleways of my steps, she was beating on the door. I said, 'Just one minute, I'm coming.' After I got down into the kitchen, I opened the door to let her in. I said, 'What is the matter with you all?' She said, 'I think I stuck George.' I said, 'Oh, no' and I kicked the door to.

"*Q.* You kicked the door what?

"*A.* Kicked the door to—shut the door.

"*Q.* You shut the door?

"*A.* Yes, I did.

"*Q.* Then what happened?

"*A.* I said, 'Whereabouts?' She said, 'In the stomach.' She think in the stomach. That's just what she say."

This last quotation of defendant's remark just after the battle leaves us with little inclination to pursue defendant's counsel's contention that Stallworth may have wounded himself by falling on his own knife. The jury had a right to believe Margie Alexander's testimony (which corresponded on this score with defendant's own formal statement to the prosecuting attorney), and to believe that defendant knew she had inflicted the wound.

The first substantial appellate question is whether or not the verdict of the jury was against the great weight of the evidence. This requires us to determine whether this record presents evidence from which the jury properly could have concluded that this killing was not committed in self-defense. :

The burden of proof to exclude the possibility that the killing was done in self-defense rests on the prosecution. *People* v. *Coughlin,* 65 Mich 704; *People* v. *Cathey,* 220 Mich 628.

Self-defense, however, requires a showing that the defendant had done "all which is reasonably in his power to avoid the necessity of extreme resistance, by retreating where retreat is safe." *Pond* v. *People,* 8 Mich 150, 176. But, as Mr. Justice CAMPBELL put it in the *Pond Case,* p 177, "a man is not * * * obliged to retreat if assaulted in his dwelling."

If the testimony of Mrs. Stallworth at the trial which bore directly on the fatal episode were to be accepted at face value, it would appear to meet the tests of self-defense spelled out above. Her testimony was, however, at substantial variance with prior statements credited to her by other witnesses.

The testimony which the jury apparently believed in our instant case seems to be that of the eyewitness, Alexander. This witness portrayed provocation by George Stallworth of somewhat less intensity than that described by defendant, and a conflict outside the home where it would have been possible for the jury to conclude that defendant might have retreated to avoid further trouble.

The trial judge, on motion for a new trial, reviewed the evidence with care and concluded that the jury verdict was not against the great weight of the evidence. Reviewing this record, we do not find error in this regard.

The second substantial question pertains to the exclusion by the trial judge of proffered testimony

pertaining to the reputation for violence on the part of the deceased.

Such testimony is generally held admissible in homicide cases, where the defendant pleads self-defense. It is held to be circumstantial evidence bearing on the state of mind of the defendant or on the question of which party was the aggressor in the affray.

"(1) *Defendant in homicide:* (a) *Reputation of the deceased.* Where a defendant charged with murder asserts that he killed in self-defense, his state of mind at the time of the killing becomes material; and an important element in determining his justification is his *belief in an impending attack* by the deceased.

"The *reputation of the deceased* for a violent, dangerous, or turbulent disposition is thus a circumstance which would cause such a belief: * * *

"The admissibility of such evidence is recognized, on principle, in all but a few jurisdictions." 2 Wigmore, Evidence (3d ed), § 246, pp 44, 45.

"The reputation or character of the victim in the assault case or the deceased in the homicide case is not directly in issue and consequently evidence thereof is not relevant except that on the question of self-defense, or who was the aggressor, such evidence has circumstantial value and will be received." 1 Jones, Evidence (5th ed), § 172, p 303.

See, also, annotation, Reputation for turbulence—admissibility, 64 ALR 1029.

It is obvious, of course, that defendant as the wife of deceased knew her husband's reputation as to violence. Indeed, she testified fully as to his violence toward her when he had been drinking. She was, however, entitled to have such substantiation on this crucial issue as she could present in the form of character testimony.

In *Hurd* v. *People,* 25 Mich 405, 418, this Court held:

"But it is further alleged as error, that the court refused to allow the defendant to show by the witness, Jerome Evans, that the deceased was a man of high temper, and quarrelsome disposition, and known by the defendant to be so at the time of the shooting. This we are satisfied, was a serious error, directly affecting the question of the defendant's guilt."

See, also, *Brownell* v. *People,* 38 Mich 732; *People* v. *Cellura,* 288 Mich 54.

This record demonstrates that defendant called or sought to employ 6 character witnesses. It also shows clearly that character testimony bearing on "the general reputation of George Stallworth in the community in which he resides for quarrelsomeness, ferocity, brutality, and vindictiveness while he is intoxicated" was rejected by the trial court after defendant had pleaded self-defense and had offered proofs which, if believed, would tend to substantiate that defense.

The exclusion was plainly error; and we cannot say on this record that it might not have affected the result.

Reversed and remanded for new trial.

DETHMERS, C. J., and CARR, KELLY, BLACK, KAVANAGH, and SOURIS, JJ., concurred.

OTIS M. SMITH, J., took no part in the decision of this case.