STATE of South Dakota, Plaintiff
and Appellee,

v.

Mark William DOKKEN, Defendant
and Appellant.

No. 14935.

Supreme Court of South Dakota.

Argued Nov. 18, 1985.

Decided April 2, 1986.

John W. Bastian, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

Jeff Larson, Minnehaha County Public Defender's Office, Sioux Falls, for defendant and appellant; Patricia C. Riepel, Minnehaha County Public Defender's Office, Sioux Falls, on brief.

HERTZ, Acting Justice.

This is a criminal appeal from a jury verdict which found the defendant guilty of first degree manslaughter and sentenced him to serve fifty years in the South Dakota Penitentiary. We reverse and remand.

The defendant/appellant Mark William Dokken, (Dokken), had experienced problems with members of the Deadmen Motorcycle Club, (Deadmen), from as far back as 1978. Their respective differences climaxed on the night of July 25, 1984, when Dokken shot Deadmen member Paul Brandsgaard, Jr., (Brandsgaard), in the Westport Lounge in Sioux Falls, South Dakota. He died early the next morning in McKennan Hospital from two gun shot wounds to the abdomen.

There was never any dispute that Dokken pulled the trigger. However, he claimed that his actions were in self-defense, and therefore, justifiable. Dokken adhered to this position throughout the trial: under cross-examination by the prosecutor, through witnesses which he produced, and by his own testimony. Although the jury concluded otherwise, it will become unmistakably clear from this opinion that Dokken was prevented from fully presenting his self-defense claim. The record reveals that the trial court ruled time after time to exclude evidence which would have aided the jury in determining the reasonableness of Dokken's actions under the circumstances, and the reasonableness of his apprehension of danger on the night in question. The cumulative effect of these rulings, therefore, convinces us that Mark William Dokken was denied his right to a fair trial.

## STATEMENT OF FACTS

According to Dokken, the Deadmen were responsible for breaking his leg some seven years earlier, and for a stabbing incident which resulted in his hospitalization for eight days. The record is inconclusive, however, as to whether the Deadmen were accountable for the latter incident. Nevertheless, the growing animosity between Dokken and members of the Deadmen can be linked to a series of events which occurred prior to the fatal shooting. As such, we reconstruct these incidents from defense counsel's offers of proof which were presented to the trial court outside the presence of the jury.

The first incident took place at the Sioux Empire Fairgrounds on July 4th, 1984, where Dokken was attending a motorcycle jumping exhibition. On this occasion, Dokken's friend Tom Watson, (Watson), was confronted by a number of Deadmen, one of whom, was Ricky Winters (Winters). After Dokken intervened on Watson's behalf, Dokken was told by Winters to get out, "or there would be bullets flying" at him.

Again outside of the jury's presence, Dokken stated that the next incident occurred just two days before the shooting, on July 23, 1984, when Dokken was told by Watson that the Deadmen were "after him." In this same offer of proof, Dokken

further stated that his girlfriend, Jada La-Roche, (LaRoche), was given some trouble by several Deadmen women in the Westport Lounge ladies room that evening. Dokken next related that on Tuesday morning, July 24, 1984, he and LaRoche woke up to find the tires on his truck slashed, and some of his tools missing. Dokken was unsure about who had slashed the tires; he believed that it was either Chuck Baecker, with whom he had a disagreement over a debt, or the Deadmen. In light of Watson's prior warning, and given the fact that Dokken believed that the Deadmen were responsible for an earlier murder near Brandon, South Dakota, he was convinced that this group would carry out their threats against him.

Defense counsel then sought to admit evidence of the next incident through the testimony of Westport Lounge manager, Ron Smith, (Smith). In an offer of proof, Smith stated that on the afternoon of Tuesday, July 24, 1984, Brandsgaard entered the Westport and asked him where Dokken was. Smith was acquainted with Brandsgaard because he occasionally worked at the Westport collecting cover charges. During the ensuing conversation with Brandsgaard, who was accompanied by an unidentified "Deadman" from Pipestone, Minnesota, Smith observed that Brandsgaard "was pretty well shaken up" about an alleged incident between Dokken and Brandsgaard's girlfriend. Thereafter, Brandsgaard and his companion told Smith that they had gone inside Dokken's trailer the night before looking for him, and found LaRoche sleeping or passed out on the floor. Inasmuch as Dokken was nowhere to be found, they went outside and slashed the tires on Dokken's truck. Moreover, they told Smith that they, "really wanted to get ahold of Mark really bad," and Brandsgaard's fellow gang member stated that, "if I get ahold of him [Dokken] he will be riding in back of the pickup, not in the front."

The trial court disallowed evidence pertaining to Watson's express warning to Dokken, LaRoche's altercation in the restroom, the tire slashing, and Smith's entire conversation with Brandsgaard the day before the shooting. In regard to Dokken's controversy with the Deadmen at the Sioux Empire Fairgrounds, he was permitted to tell the jury that on July 4th, 1984, he had a confrontation with a group of people, and that one of those people was Ricky Winters. Dokken was further allowed to state that as a result of a conversation with Watson on July 23, 1984, Dokken began carrying a handgun which he had previously left with a friend. The jury was not permitted to hear, however, any evidence pursuant to Winter's statement about "bullets flying," or Watson's caution that the Deadmen were after Dokken.

Brandsgaard's girlfriend, Deloras (Dee) Peterson, (Peterson), testified at trial. She was employed as a cocktail waitress at the Westport Lounge at all times pertinent to this action. She stated that Dokken was a regular customer at the Westport, and that he was present there on Monday evening July 23, 1984. Peterson further stated that Dokken insisted upon questioning her about the July 4th incident at the motorcycle jump. Although she told Dokken that she had no information, Peterson testified that he continued to bother her throughout the evening. Later that night when Peterson was leaving the bar to go home, she stated that Dokken attempted to run her down with his pickup truck in the Westport parking lot. Peterson told Brandsgaard about this incident shortly thereafter.

On Wednesday, July 25, 1985, Dokken had been working on a landscaping job at an apartment complex in Sioux Falls with Paul Clancy, (Clancy), LaRoche, and his cousin, Dave Castle, (Castle). After work, the quartet went to the Crow Bar where they were met by Clancy's girlfriend, Dolly Olson. At approximately 7:00 p.m., Dokken and Castle left the bar to pick up some railroad ties for use on a landscaping project. They proceeded to an area in the vicinity of the intersection of North Cliff Avenue and Old Benson Road where they loaded approximately eight ties. Shortly thereafter, Chuck Baecker, (Baecker), arrived and an argument ensued between

Dokken and Baecker as to who owned the railroad ties. Dokken testified that Baecker was slapping him around. This conduct prompted Dokken to reach into the pickup truck and pull out his gun. According to Dokken, he told Baecker to back off. The State's witness, however, testified that Dokken threatened to shoot Baecker. Nevertheless, Baecker retreated after this exchange, and Dokken and Castle proceeded to take the ties to the job site.

After delivering the ties, Dokken and Castle went to the Westport Lounge at about 9:00 or 10:00 p.m., at which time Dokken called LaRoche to come and pick him up. LaRoche arrived approximately thirty minutes later to find Dokken sitting in a booth with Castle and Larry Gordon. LaRoche stood at the bar and was joined by Dokken soon afterward.

On this same evening, members of the Deadmen, their families, and friends were gathered for a barbecue on the east side of Sioux Falls. Among the people present at this gathering, were Brandsgaard, Winters, and Mr. and Mrs. Charlie and Robin Davis. Brandsgaard received a call from Peterson who was working at the Westport that evening. Thereafter, Brandsgaard, Winters and the Davises left the party and rode their motorcycles to the Westport Lounge. Despite the fact that Smith had specifically told Brandsgaard not to do so, the foursome entered the lounge wearing their "biker colors" which included leather jackets, chaps, hats, boots and bracelets with metal studs on them; as well as bandanas. Winters had a spur on his boot and some of the others wore buck knives on their belts. It was later revealed at trial that Robin Davis was carrying a pistol in her purse.

Within minutes after entering the Westport, Brandsgaard told Winters that he had a problem with Dokken and wanted to talk to him. Both Brandsgaard and Winters then got up from the table and approached Dokken. Brandsgaard told Dokken that he wanted to talk to him outside. Here, the evidence becomes conflicting. Dokken testified that both Brandsgaard and Winters

grabbed ahold of his arms and began dragging him either towards the door, or in the direction of the other Deadmen. Dokken further stated that Brandsgaard had ahold of his hair and was bending him over. Robin Davis testified, however, that she thought that Dokken and Brandsgaard were friends, and that they were walking back toward the Deadmen's table. Seconds later, Dokken pulled the gun out of his trousers and fired two shots in rapid succession which hit Brandsgaard in the abdomen. Charlie Davis testified that Dokken next pointed the gun at Davis' head and then returned to the bar, took a sip of his drink, and left with LaRoche.

The pair walked out of the lounge and were in the process of running toward her car when Dokken was felled by two bullets. He was allegedly shot by either Ricky Winters or Charlie Davis. Dokken managed to get to the car and told LaRoche to take him to the Sioux Valley Hospital. As she sped toward the hospital, LaRoche missed the turnoff to Eighteenth Street and at Dokken's request, brought the car to a halt. By this time the police were following LaRoche's vehicle and were attempting to pull it over. Dokken got out of the car and voluntarily placed the gun on the roof of the automobile. He told the police that he had shot one of the Deadmen but that he did not know the individual's name. Thereafter, Dokken was taken to the hospital where it was determined that he had been shot once in the back of the head and once in the buttocks. Following a sixteen day hospital stay, Dokken was released into the custody of the police.

Among his assignments of error, Dokken argues that the trial court erred by admitting evidence pertaining to his altercations with Baecker and Peterson, respectively; and that it was error to exclude evidence concerning the July 4th incident, Brandsgaard's past criminal record, Dokken's knowledge that the Deadmen were after him, and Ron Smith's conversation with Brandsgaard the day before the shooting. He further contends that the trial court erred in instructing the jury pursuant to

confessions. The issues herein will be separately stated under appropriate headings.

## I

WHETHER THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF AN INCIDENT INVOLVING DOKKEN'S USE OF THE SAME FIRE-ARM APPROXIMATELY FOUR HOURS BEFORE THE FATAL SHOOT-ING?

State moved to introduce evidence of Dokken's argument with Chuck Baecker which occurred on the same evening that Brandsgaard was shot. The trial court granted admission of this evidence over defense counsel's objection. Thereafter, the State presented evidence to the jury which revealed that Dokken drew the same handgun on Baecker some four hours earlier as a result of their argument over the ownership of the railroad ties. On appeal, Dokken argues that this evidence was inadmissible under any of the statutory exceptions codified in SDCL 19-12-5, because its only purpose was to show that he possessed a "bad character" and thus, acted in conformity therewith in the subsequent shooting of Brandsgaard.

Evidence of crimes or acts other than the ones with which an accused is charged, are generally inadmissible. The general rule and its exceptions are set forth in SDCL 19-12-5 which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

■ Here, the trial court had the discretionary power to admit evidence of the Baecker incident so long as it was relevant to the shooting at the Westport. *See: State v. Means*, 363 N.W.2d 565, 568 (S.D. 1985), *State v. Johnson*, 316 N.W.2d 652, 654 (S.D.1982), SDCL 19-12-1. Thereafter, the trial court was required to perform the "balancing test" to assure that the probative value of this evidence substantially outweighed its prejudicial effect upon Dokken. SDCL 19-12-3. Evidence of the Baecker incident was no doubt prejudicial to Dokken. However, we noted in *State v. Iron Shell*, 336 N.W.2d 372, 375 (S.D.1983), that "prejudice" does not mean the damage to the opponent's case that results from the legitimate probative force of the evidence, but rather from the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means. Our standard for review is whether the trial court abused its discretion. *State v. Pedde*, 334 N.W.2d 41, 43 (S.D.1983).

■ We find no abuse of discretion. SDCL 19-12-5 expressly states that "other acts" evidence may be admissible for other purposes; some of which are enumerated in the statute, however, this listing does not limit the scope of "other purposes" for which this evidence may be admissible. *See: State v. Fender*, 358 N.W.2d 248, 253 (S.D.1984). In affirming the trial court in *Fender, supra*, we ruled that evidence of the defendant's prior conduct was necessary to provide the jury with a foundation and background pursuant to the crime charged, and to show the defendant's state and frame of mind. It follows, therefore, that evidence of the Baecker incident was probative of Dokken's state of mind some four hours later when he shot Brandsgaard. As such, this evidence tended to show that Dokken was ready, willing and able to draw his gun to settle a dispute.

Moreover, we wrote in *State v. Willis*, 370 N.W.2d 193, 198 (S.D.1985), that the term "modus operandi" is included within the "plan" exception in SDCL 19-12-5. Thus, we stated that the plan exception requires that the former acts should indicate, by common features, a plan or design which tends to show that it was carried out by doing the act charged. Here, the Baecker incident and Dokken's later altercation with the Deadmen were closely related in time and shared common features. Germane to both incidents was the fact

that Dokken was provoked by Baecker and then the Deadmen, to which he responded by drawing his gun after being slapped around, (by Baecker), and grabbed by the arms and hair, (by Brandsgaard and Winters). Inasmuch as Dokken maintained that he was in fear for his life and shot Brandsgaard in self-defense, we find that evidence of his prior conduct under substantially similar circumstances some four hours earlier with Baecker, was admissible under *Fender, supra,* to provide the jury with the foundation and background necessary for their determination of the reasonableness of Dokken's later conduct at the Westport.

We hold that evidence of the Baecker incident was admissible to show Dokken's state of mind, modus operandi, plan, preparation, motive and intent relative to the subsequent shooting of Brandsgaard. As such, we affirm the trial court's ruling upon this evidence.

## II
### WHETHER THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF AN ALLEGED INCIDENT BETWEEN DOKKEN AND THE DECEDENT'S GIRLFRIEND?

■ Over defense counsel's objection, the trial court permitted the State to introduce evidence of Dokken's altercation with Dee Peterson two nights before the shooting. Her testimony amounted to an allegation that Dokken attempted to run her over with his pickup truck in the parking lot of the Westport Lounge. We hold that this was error on the part of the trial court.

In *State v. Reddington,* 80 S.D. 390, 396, 125 N.W.2d 58, 62 (1963), we said that "[p]rejudicial error is such error as in all probability must have produced some effect upon the final result of the trial, namely, the verdict of the jury." Here, Peterson's testimony bore no relevancy to any of the issues in the case. Furthermore, although the delicate balancing process set forth in SDCL 19–12–3, is within the trial court's sound discretion, *Means, supra,* this evidence was highly prejudicial and

served no other purpose than to characterize Dokken as a "bad man", which is precisely what SDCL 19–12–5 prohibits. Therefore, we hold that evidence of Dokken's alleged altercation with Peterson should be excluded upon retrial.

## III
### WHETHER THE TRIAL COURT ERRED IN EXCLUDING EVIDENCE:
A. OF THREATS TO DOKKEN THREE WEEKS BEFORE THE SHOOTING?

B. OF THE DECEDENT'S PRIOR CRIMINAL RECORD?

C. OF DOKKEN'S KNOWLEDGE THAT THE DEADMEN WERE AFTER HIM?.

D. OF RON SMITH'S CONVERSATION WITH THE DECEDENT AND ANOTHER "DEADMAN" THE DAY BEFORE THE SHOOTING?

### A.
OF THREATS TO DOKKEN THREE WEEKS BEFORE THE SHOOTING?

■ The 4th of July incident was mentioned by Dee Peterson in the prosecution's case in chief. Thereafter, the defense sought to introduce testimony by Dokken, LaRoche and Watson relative to Winters' threat to Dokken about "bullets flying" at him. The trial court refused to allow this testimony because Dokken could not prove that Brandsgaard was present at the motorcycle jump. It did permit, however, some reference to Dokken's confrontation with a "group" on July 4th, but the trial court excluded the actual threats or who made them.

Dokken argues that the trial court committed reversible error when it denied admission of Winters' threat because it was probative of Dokken's fear of Winters individually, as well as his fear of Winters and Brandsgaard as members of the Deadmen Motorcycle Club. He contends that the jury had no information from which to determine the reasonableness of his conduct

at the Westport relative to the claim of justification, given that the jury was denied access to evidence responsive to why Dokken feared the Deadmen as a group, and each and every "Deadman" which comprised that group. We agree.

From the outset of this opinion, we indicated that the jury was entitled to know all evidence bearing upon the reasonableness of Dokken's claim of self-defense. Whether or not Brandsgaard was at the motorcycle jump was immaterial. Winters threatened Dokken with "bullets flying" on July 4th, and three weeks later, Winters and Brandsgaard approached Dokken at the Westport. As mentioned previously, Dokken feared the Deadmen as a group, of which both Winters and Brandsgaard were members. It follows, therefore, that he feared them individually, regardless of whether or not he knew Brandsgaard by name. Given Winters' threat at the motorcycle jump, and in view of the fact that when Brandsgaard and Winters entered the Westport that night they did so as Deadmen, as evidenced by their companions and dress, the excluded evidence thus showed why Dokken had reason to fear them when they approached him at the bar. Inasmuch as this evidence directly related to Dokken's claim of justification, we hold that its exclusion constituted error.

Pertinent to this discussion is *Reddington, supra,* wherein the defendant appealed his conviction for murder. Among his assignments of error, he argued that since the evidence preponderated in his favor, or was at least closely balanced, then the trial proceedings may have tipped the scales against him and should be held as prejudicial. In affirming the trial court's judgment of conviction, we held that, "a new trial should not be granted unless it is reasonably clear that the substantial rights of the defendant have been so violated that he did not receive a fair trial." *Reddington,* 80 S.D. at 397, 125 N.W.2d at 62. Furthermore, the *Reddington* appeal provided this court with the opportunity to discuss prejudicial error. As such, we stated:

Prejudicial error is such error as in all probability must have produced some effect upon the final result of the trial, namely, the verdict of the jury. Prejudicial error ... is harmful to the substantial rights of the party assigning it. (Citations omitted)

*Id.* South Dakota's "harmless error" rule is codified in SDCL 23A–44–14, and provides that, "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

The United States Supreme Court delineated guidelines pertinent to harmless constitutional error in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In *Chapman,* the petitioners were convicted in a California state court for robbery, kidnapping and murder. At the time of trial, California's Constitution allowed the jury to consider commentary made by the court and prosecution relative to the defendant's testimony or his failure to testify, and his failure to explain or to deny by his testimony any evidence or facts in the case. Both petitioners chose not to testify at trial, and the state's attorney exercised his right under the California Constitution to comment upon their failure to do so. The trial court also charged the jury that it could draw adverse inferences from petitioners' failure to testify. *Id.* 386 U.S. at 19, 87 S.Ct. at 825, 17 L.Ed.2d at 707–708.

In reversing and remanding the convictions, the Supreme Court prefaced its decision by stating that the application of a state harmless error rule is a state question where it involves only errors of state procedure or state law. However, the court further stated that when a state has failed to accord federal constitutionally guaranteed rights, then federal law, rather than state law, is applicable in fashioning a rule as to what constitutes harmless error. The opinion notes that not all federal constitutional errors will always be deemed harmful *Id.* 386 U.S. at 21, 87 S.Ct. at 826, 17 L.Ed.2d at 708–709.

However, the court stated that there are some constitutional rights so basic to a fair

trial, such as the violation of these petitioners' 5th amendment rights, that their infraction can never be treated as harmless error. Thereafter, the Court set forth the following standard:

In order for an error involving the denial of a federal constitutional right to be held harmless in a state criminal case, the reviewing court must be satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction.

*Id.* 386 U.S. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710–711. This court has acknowledged that the harmless error rule ought never be used to justify unfairness at the trial. *State v. Webb,* 251 N.W.2d 687 (S.D.1977).

South Dakota's standard for harmless error, not unlike its federal counterparts, emphasizes "substantial rights." SDCL 23A–44–14. *See also:* 28 U.S.C. § 2111 and Fed.Rule Crim.Proc. 52(a). In the case at bar, the jury was entitled to consider all of the circumstances surrounding the shooting at the Westport in determining whether Dokken had reasonable grounds to believe grievous bodily harm was about to be inflicted upon him by Brandsgaard and Winters. *See: State v. Lewis,* 6 Wash. App. 38, 491 P.2d 1062, 1064 (1971). As such, the exclusion of the crucial details of the July 4th incident substantially affected Dokken's right to a fair trial, inasmuch as the ruling prevented him from fleshing-out his self-defense claim. Thus, we find that the trial court's diluted version of the July 4th incident effectively thwarted Dokken's later claim of justification since the evidence, as admitted, failed to identify which "group" he was confronted with, as well as who made the threat of "bullets flying".

However, the excluded evidence was also probative upon the issue of who the aggressor was at the Westport on the night in question. Knowledge that Winters made the actual threat on July 4th was a critical factor for the jury in relation to Dokken's claim of self-defense against both Winters and Brandsgaard. To that end, the Michigan Court of Appeals' holding in

*People v. Johnson,* 112 Mich.App. 483, 316 N.W.2d 247 (1982), is pertinent. The court stated that when an accused is attacked by two or more persons, or is attacked by one person with others aiding and encouraging him, the accused has a right to act in self-defense against one or all of them. *Id.* 316 N.W.2d at 249. Indeed, the crucial, yet absent details of the July 4th incident would have provided the jury with a background as to why Dokken perceived danger when he was approached by the Deadmen moments before the shooting.

We hold, therefore, that evidence of the July 4th incident was admissible to show who the aggressor was at the Westport. Furthermore this evidence was probative upon the self-defense issue because it indicated Dokken's state of mind at the time of the shooting, and it tended to show that he had reason to fear Winters because of his previous threat, and Winters and Brandsgaard collectively, as Deadmen.

### B.

### OF THE DECEDENT'S PRIOR CRIMINAL RECORD?

■ At trial, Dokken sought to introduce evidence of Brandsgaard's four-year old convictions for simple assault and a firearms charge relative to the issue of who the aggressor was. The trial court denied this offer. We affirm the trial court's ruling in this respect, and hold our decision in *State v. Padgett,* 291 N.W.2d 796 (S.D. 1980) dispositive of this issue.

In *Padgett,* the defendant appealed his conviction for second-degree manslaughter. Specifically, he argued that he should have been permitted to introduce evidence, other than reputation, about the true nature of the victim in order to establish the fact that the victim had propensities toward violent behavior. Thus, Padgett attempted to introduce evidence of the victim's 1977 arrest report, an order committing him to the Human Services Center in Yankton in 1972, and a conviction on an assault charge which occurred in 1971. The trial court found that the 1972 committal proceeding

and the 1971 assault conviction were too remote, and that the 1977 charge lacked probative value.

In affirming the trial court's ruling, we stated that:

> Appellant has presented us with no persuasive authority that SDCL 19–12–4 (Rule 404(a) of the Federal Rules of Evidence) is not in accord with the majority rule that evidence of specific acts may not be used circumstantially to prove a victim's probable conduct on the occasion of the alleged crime, (citation omitted), nor to corroborate a defendant's theory that he was acting out of a reasonable fear for his own safety and in the reasonable exercise of deadly force in resisting the victim's attack.

*Id.* at 799.

In *Padgett,* this court adopted the majority rule that evidence of specific acts of violence or quarrelsomeness on the part of the victim are not admissible on the issue of self-defense. Accordingly, Brandsgaard's prior criminal record was properly excluded at trial.

### C.

### OF DOKKEN'S KNOWLEDGE THAT THE DEADMEN WERE AFTER HIM?

█ Two days before the shooting, Tom Watson told Dokken that the Deadmen were after him. The trial court disallowed this evidence, however, it permitted Dokken to state that due to a conversation with Watson, Dokken retrieved a handgun that he had previously loaned to a friend. We hold that the trial court's exclusion of Watson's express warning is reversible error.

Similar to the July 4th incident involving Winters, Watson's warning provided another important link in the chain of events which led up to the conflict between Dokken and the Deadmen before Brandsgaard was shot. We find that this evidence was admissible to show that Dokken feared the Deadmen as a group. Thus, it tended to support his self-defense claim by showing why he feared Brandsgaard and Winters when they confronted him in the bar.

Initially, we examine whether a group threat is as relevant as an alleged threat or notice of concerted action by a group. As we noted in *Johnson, supra,* a person has a right of self-defense against a group and its members. *Id.* 316 N.W.2d at 249. In *Williams v. Commonwealth,* 228 Ky. 322, 14 S.W.2d 1077 (1929), the court held that when the defendant was assaulted by a party of four acting in concert, he was entitled to defend himself not only against the primary attacker, but against anyone acting in concert with the primary attacker. *See also: Osborne v. Commonwealth,* 242 Ky. 574, 46 S.W.2d 1066, 1070 (1932). In *Scott v. Commonwealth,* 289 Ky. 436, 159 S.W.2d 13 (1942), the court held that a defendant returning gunfire to a group firing at him had a right to defend against any of his assailants. The court stated, "[w]e think it is prejudicial error to restrict the defendant's right of self-defense as against the assault of the deceased only." *Id. See also: Helton v. Commonwealth,* 291 S.W.2d 40, 41 (Ky.1956). In *Wilkes v. State,* 103 Tex.Cr.R. 209, 280 S.W. 787 (1926), the court held that when the defendant and a companion were attacked by two people, the defendant had a right to defend against either. Finally, in *People v. Bush,* 414 Ill. 441, 111 N.E.2d 326 (1953), the court reversed the defendant's murder conviction when the defendant, surrounded by an unfriendly group slashed out at the group with a knife, killing one of its members. The foregoing authorities underscore the proposition that actions of a group, statements on behalf of a group, and fear of a group, are all relevant factors in cases where the issue of justification is raised.

Knowledge of Watson's warning would have helped the jury analyze Dokken's conduct at the Westport in light of his own perceptions of the situation. As such, "the justification of self-defense is to be evaluated in light of all the facts and circumstances known to the defendant, including those known substantially before the killing." *See: State v. Wanrow,* 88 Wash.2d 221, 559 P.2d 548, 555 (1977); *State v. Samp-*

*son,* 40 Wash.App. 594, 699 P.2d 1253, 1256 (1985) ["[t]he reasonableness of the defendant's use of force is to be evaluated from the defendant's perspective under the facts and circumstances known to the defendant."]; *State v. Allery,* 101 Wash.2d 591, 682 P.2d 312, 316 (1984).

It cannot be overemphasized that whether or not the Deadmen were, in fact, out to get Dokken is irrelevant upon this issue. Whether or not he thought they were out to get him, and whether those beliefs were reasonable under the circumstances, are the cogent factors. As the Michigan Court of Appeals stated in *People v. Perez,* 66 Mich.App. 685, 239 N.W.2d 432, 435 (1976), "[t]he self-defense justification for homicide is based upon the circumstances as they appeared to the defendant, and not as they actually existed[.]" *See also: State v. Leidholm,* 334 N.W.2d 811 (N.D.1983). The fact that Dokken had reason to believe that the Deadmen were after him was critical to the jury's determination of his self-defense claim. We hold that the trial court erred in failing to admit evidence of Watson's specific warning for jury consideration.

### D.

### OF RON SMITH'S CONVERSATION WITH THE DECEDENT AND ANOTHER "DEADMAN" THE DAY BEFORE THE SHOOTING?

■ In defense counsel's offer of proof, Westport Lounge manager, Ron Smith, (Smith), testified that the day before the shooting, he was present during a conversation with Brandsgaard and another "Deadman" who entered the bar looking for Dokken; that Brandsgaard was upset about an incident with his girlfriend; that they entered Dokken's trailer house the night before to look for him, but settled for slashing his tires; that they wanted to get ahold of Dokken "really bad"; and that Brandsgaard's companion stated, "[i]f I get ahold of him [Dokken] he will be riding in the back of the pickup, not the front." The trial court denied this offer in its entirety.

We affirm the trial court's ruling pursuant to the alleged tire slashing. Although Dokken suspected that the Deadmen were responsible for this incident, he testified that the tires could have been slashed by either Chuck Baecker, or the Deadmen. Furthermore, our holding, in *Padgett, supra,* prohibits the use of this evidence for the purpose of showing a specific, prior act of violence by Brandsgaard in order to corroborate Dokken's self-defense claim.

We find, however, that evidence of Smith's conversation with Brandsgaard pertinent to wanting to get ahold of Dokken "really bad", and the statement made by the unidentified "Deadman" pursuant to "riding in the back of the pickup truck", were admissible upon the issue of who initiated the conflict at the Westport. The fact that Dokken did not learn about this conversation until after the shooting does not preclude admission of this evidence under *Padgett.* Rather, this evidence is admissible not to show Brandsgaard's state of mind or propensity toward violence, but to show who the aggressor was to aid the jury in determining the reasonableness of Dokken's self-defense argument.

In *State v. Grimes,* 90 S.D. 43, 48, 237 N.W.2d 900, 902 (1976), we wrote that, "as with self-defense, so also with the defense of any other[,] one is not justified in using force for protection unless [he] *reasonably* believes that there is immediate danger of unlawful bodily harm." (emphasis in original). It follows here that one of the factors bearing upon the reasonableness of Dokken's actions was whether he or Brandsgaard was the aggressor. Therefore, evidence of Smith's conversation with Brandsgaard and another gang member, both of whom made threats against Dokken, was probative to show who started the altercation that led up to the shooting.

In holding this portion of Smith's testimony admissible, we find that the Deadmen's threats were admissible hearsay. *See:* SDCL 19–16–32 and 19–16–35. As such, they were admissions against interest made by Brandsgaard and his companion directly to Smith who held no apparent bias

toward either Dokken or the Deadmen, and Smith was also available for cross-examination. Moreover, evidence of Winters' prior threat and Watson's warning which we have held admissible, provide the necessary corroborating circumstances indicative of the trustworthiness of Smith's testimony. More importantly, however, this evidence is probative of a material fact, e.g., who the aggressor was, and is a critical element in a fair presentation of Dokken's self-defense claim.

This evidence was also admissible to refute Robin Davis' testimony about the meeting between Dokken and Brandsgaard which immediately preceded the shooting. Davis stated that Brandsgaard and Dokken were walking back to the Deadmen's table, that she thought they were friends, and that they were going to sit down. By contrast, the defense witnesses testified that Dokken was being dragged toward the door. We find that evidence of Winters' threat along with Smith's conversation with Brandsgaard and a fellow "Deadman", tended to corroborate Dokken's position that he was not the aggressor. *See also:* SDCL 19–12–4(2).

Furthermore, there is support for the admissibility of this evidence even though Dokken did not learn of these uncommunicated threats until after the shooting. In *Griffin v. United States*, 183 F.2d 990, 992 (D.C.Cir.1950), the court held that an opened knife found in the victim's pocket was an uncommunicated threat to do bodily harm to the defendant. The court stated:

> The view that evidence of uncommunicated threats, including the evidence of Hunter's open knife, should be admitted seems to us logical and humane[.] It is of course true that the apparent conduct of the deceased at the time of the homicide, rather than any concealed plan he may have had, bears directly on the question whether the accused acted in self-defense, but evidence that the deceased had a concealed plan of attack bears on the question [of] what his apparent conduct was. We therefore adopt the following rule[,] [w]hen a defendant claims self-de-

fense and there is substantial evidence, though it be only his own testimony, that the deceased attacked him, evidence of uncommunicated threats of the deceased against the defendant is admissible.

Similarly, in *State v. Thurston*, 299 Minn. 30, 216 N.W.2d 267 (1974), the court held that to exclude testimony concerning evidence of uncommunicated threats was prejudicial error. As noted in *State v. Minton*, 228 N.C. 15, 44 S.E.2d 346 (1947), the threats should be closely related in time. Here, Smith's testimony related to threats made against Dokken one day before the shooting.

Evidence of these threats also corroborated the direct threat made by Winters and communicated to Dokken, as well as the warning Dokken received that the Deadmen were after him. In *State v. Baldwin*, 155 N.C. 494, 71 S.E.2d 212, 213 (1911), the trial court excluded uncommunicated threats which tended to show the victim's animosity towards the defendant "and a purpose to do him serious bodily harm." In reversing Baldwin's manslaughter conviction the court stated:

> It is now generally recognized that in trials for homicide uncommunicated threats are admissible, where they tend to corroborate threats which have been communicated to the prisoner; second, where they tend to throw light on the occurrence and aid the jury to a correct interpretation of the same and there is testimony ultra sufficient to carry the case to the jury, tending to show that the killing may have been done from a principle of self-preservation[.]

In the instant action, Smith's testimony was admissible under the *Baldwin* ruling, for either purpose.

In *People v. Wright*, 294 Mich. 20, 292 N.W. 539 (1940), the trial court excluded evidence that the decedent made the comment at a bar shortly before the shooting that "I am going to get him." That comment was never heard by the defendant. The defendant was also precluded from asking about a prior incident involving the victim's use of a gun. The court held that

to preclude defense counsel from going into those areas "denied defendant his right to a fair and impartial trial." *Id.* 292 N.W. at 542.

Based on the foregoing authorities, we find that Smith's testimony was probative upon the self-defense issue, and thus, pertinent for jury consideration because it tended to indicate that the Deadmen had a plan and an intent to do injury to Dokken. As such, Smith's offer of proof would have substantiated that plan. In *People v. Cellura*, 288 Mich. 54, 284 N.W. 643, 646 (1939), the defendant appealed his homicide conviction, and sought to admit evidence that the decedent and an accomplice had a plan to kidnap him. The court ruled that, "[i]n a homicide case, the accused may prove the existence of a conspiracy to kill or assault him as part of the res gestae, when there is an issue of self-defense." Similarly, in *Griffin, supra,* the court found the opened knife in the decedent's pocket to be evidence of a concealed plan of attack. Again, in *Cellura,* the court held that, "a conspiracy, although unknown to the defendant at the time of the homicide, would bear upon the question of who was the aggressor." *Cellura,* 284 N.W. at 646. Accordingly, we hold that the trial court erred in failing to admit that part of Smith's testimony above mentioned, because it was probative as to who initiated the incident, and thus, supported Dokken's claim of justification.

As we stated initially, the cumulative effect of the trial court's exclusion of the July 4th incident, Watson's warning, and the portion of Smith's testimony referenced above, convinces us that Dokken was prevented from using evidence necessary to fully present his self-defense claim. Therefore, in accordance with our decision in *Reddington, supra,* we hold that Dokken is entitled to a new trial inasmuch as the rulings below make it overwhelmingly clear, that Dokken's substantial rights were so violated that he did not receive a fair trial.

## IV

## WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURY PURSUANT TO CONFESSIONS IN INSTRUCTION # 30?

█ Without deciding that it was reversible error in and of itself, we next consider Dokken's assignment of error pursuant to jury instruction # 30. Defense counsel objected to the inclusion of this instruction on the grounds that Dokken's statements made after arrest did not amount to a confession. The trial court over-ruled the objection. Instruction # 30 is essentially South Dakota Pattern Jury Instruction (Criminal) 1–16–2. It contains a definition of "confession", however, instruction # 30 omits the distinction between confessions and admissions.

Following his arrest, Dokken waived his Miranda rights and made certain statements to the police. At trial, the arresting officer testified, in essence, that subsequent to arrest, Dokken stated that he shot one of the Deadmen, that he didn't know who the individual was, but that he could identify him. On appeal, Dokken argues that these statements constituted an admission to the act of shooting and not a confession to the crime of murder. We agree.

In *State v. Callaghan,* 81 N.J.Super. 518, 196 A.2d 245, 248 (1963), the defendant appealed his conviction for assault and battery. Callaghan sought to exclude a statement he made to a police officer to the effect that he slapped the complainant. The Superior Court of New Jersey took this opportunity to discuss the difference between a confession and an admission relative to a separate legal issue in dispute. To that end, the following comments are relevant to the instant action:

> [T]he statement herein made by the defendant to the detective was not a "confession" but rather an "admission" of one of the facts in issue. A confession is an admission of guilt by a party charged with a crime. It is a special kind of admission. *Every confession is an admission but not every admission is a confession.* Thus, there may be an ad-

mission of some fact in issue without its being an admission of guilt of the crime charged. (emphasis added)

*Id.* 196 A.2d at 246.

In *Callaghan,* the court went on to say that the defendant's admission to slapping the complainant was not *per se* an admission of guilt to the crime of assault and battery. The court continued: "[t]he slapping may have been accidental and unintended; he may very well have had a legal defense to the charge even though he admitted the physical act."

Here, Dokken's admission to shooting one of the Deadmen was not an automatic confession to killing Paul Brandsgaard, Jr. with premeditated design. Rather, Dokken's admission to shooting one of the Deadmen embraced an inculpative fact, e.g., that he pulled the trigger, however, it did not concede the central fact of his guilt for murder or first degree manslaughter. *See: Callaghan,* 196 A.2d at 249. This is especially true in light of Dokken's claim of justification.

We find, therefore, that instruction # 30 as it was used below was incomplete, given its failure to distinguish between confessions and admissions, and coupled with the arresting officer's testimony, prejudicially misleading. As such, we hold that the trial court erred in over-ruling defense counsel's objection.

We have considered the remaining issues and find them to be without merit, especially in view of the new trial mandated by this reversal.

We accordingly reverse the trial court, and remand this case for a new trial consistent with the guidelines set forth above.

MORGAN and WUEST, JJ., concur.

HENDERSON, J., concurs specially.

FOSHEIM, C.J., concurs in part and dissents in part.

SABERS, J., not having been a member of the Court at the time this action was submitted to the Court, did not participate.

HENDERSON, Justice (specially concurring).

**I.**

Federal harmless error discourse bursts forth like an intellectual meteor. Welcome—the blessing of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Note its approval in dissent of this author in *State v. Chief Eagle,* 377 N.W.2d 141, 144 (S.D.1985), and collected cases on prejudicial error threat cited.

**II.**

In *Chief Eagle,* 377 N.W.2d at 146, I deplored his being tried on a collateral matter with extrinsic evidence. *See* J. Weinstein & M. Berger, 3 *Weinstein's Evidence,* ¶ 608[05] (1985). Here, this Court cites with approval *State v. Padgett,* 291 N.W.2d 796 (S.D.1980), for, essentially, evidence of specific acts may not be used circumstantially to prove a *victim's* probable conduct on the occasion of the alleged crime. *See also, State v. Tribitt,* 327 N.W.2d 132, 134–35 (S.D.1982), cited in my dissent in *Chief Eagle,* 377 N.W.2d at 144:

Ample authority exists holding that FRE 608(b), the federal counterpart to SDCL 19–14–10, excludes extrinsic evidence of specific acts. *United States v. Powers,* 622 F.2d 317, 324 (8th Cir.1980), *cert. denied,* 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980); *United States v. Werbrouck,* 589 F.2d 273, 277–78 (7th Cir. 1978), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1507, 59 L.Ed.2d 776 (1978).

FOSHEIM, Chief Justice (concurring in part, dissenting in part).

I concur on issues I, III, and IV. However, I am unable to conclude that the trial court abused its discretion in admitting testimony from the decedent's girlfriend that two nights prior to the shooting Dokken attempted to run her over with a vehicle in the parking lot of the Westport Lounge. Therefore, I dissent on the second issue.

Evidence of this altercation does not exclusively reflect Dokken's "bad character." On the contrary, it may tend to establish

another reason why Dokken feared the decedent and, hence, support his claim of self-defense. Accordingly, the trial court cannot be said to be clearly erroneous.

Further, admission of this evidence is as relevant as other prior confrontations between Dokken and members and associates of the motorcycle gang. Since the majority seeks to include all evidence "which would [aid] the jury in determining the reasonableness of Dokken's actions under the circumstances, and the reasonableness of his apprehension of danger on the night in question[,]" we should be consistent and uphold the trial court's decision to admit evidence of the incident between Dokken and the decedent's girlfriend.