**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Richard R. TITUS, Defendant and Appellant.**

No. 15904.

Supreme Court of South Dakota.

Considered on Briefs April 28, 1988.

Decided July 13, 1988.

Frank Geaghan, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Roger A. Tellinghuisen Atty. Gen., Pierre, on brief.

Catherine E. Mattson of LaFleur, La-Fleur & LaFleur, Rapid City, for defendant and appellant.

SABERS, Justice.

Defendant appeals his conviction for first-degree burglary.

*Facts*

In the late evening of December 18, 1986, Brian and Janelle French returned to their home in Rapid City to find that it had been burglarized. Glass in the back door window had been broken allowing the burglar to reach in and unlock the door. The Frenchs discovered that a color television, a video cassette recorder, a compact disc player, tape decks, a cable box, compact discs, VHS tapes, two martial arts weapons, and 25–30 pounds of deer meat were missing. The burglar also apparently drank the remainder of four or five bottles of liquor.

The missing martial arts weapons caused Brian French to suspect neighborhood acquaintance, Richard Titus (Titus). Several weeks earlier, Titus visited the French home and expressed a keen interest in these martial arts weapons. Another prior conversation made Titus aware that December 18th, a Thursday, was Brian French's league bowling night and that Janelle French usually accompanied her husband. A police officer investigating the scene recovered a TV shock adapter in the alley between the French home and Titus' residence.

The morning following the burglary, Rapid City Police detectives visited the residence identified by Brian French as Titus'. This home, located across the alley and two houses away, was owned by the Peters family. Titus lived there as a renter and shared a room with Cory Peters (Cory). Steve Peters, Cory's brother, gave permission to the detectives to search the Peters' residence. Detectives discovered the missing electronics equipment, tapes, and martial arts weapons in the upstairs bedroom shared by Titus and Cory. The deer meat was located in the Peters' freezer. Detectives recovered the stolen items and left

word that Cory and Titus should contact the police department as soon as possible.

On December 21, 1986, Titus went to the police department and gave a statement to a detective. Titus stated that he had been drinking heavily at a bar on the evening of the burglary. He did not remember how he got home from the bar. He had a recollection of being inside the French home, but no recollection of anything else until he awoke the next morning and found the stolen items in his room. Titus was later arrested and charged with first-degree burglary.

Cory testified at Titus' trial that Titus woke him about 10:30 or 11:00 p.m. on the evening of December 18th and asked him to help carry some things into the house. Cory accompanied Titus to the alley near the family garage where there were various pieces of electronic equipment. He and Titus carried these items to their bedroom. Cory testified that Titus was extremely drunk, slurring his words and mumbling, and unable to say where he had gotten the equipment. Evidence was presented that the VCR and color TV had been connected by Titus so that he could watch some VCR tapes.

1. INTENT WAS A MATERIAL ISSUE AND TITUS' PRIOR BURGLARY CONVICTION WAS ADMISSIBLE

State moved to admit Titus' 1978 burglary conviction as a prior bad act under SDCL 19–12–5. The trial court ruled that evidence of the fact of the prior burglary conviction was admissible because Titus' defense was lack of specific intent and/or diminished capacity and that the evidence was relevant and highly probative. On appeal, Titus claims that the prior bad act evidence was irrelevant and the probative value did not substantially outweigh the prejudice.

■ Initially, State erroneously argues that SDCL 19–12–5 (Rule 404(b)) is an "inclusionary" rule which permits the use of relevant prior crimes or acts "for all purposes" other than to prove character and conformity thereto. Titus argues that a

conviction in 1978, eight years prior to the crime now charged, is too remote to be probative on the issue of intent. Titus cites several cases holding crimes committed five to thirteen years prior to the crime at issue are too remote. *State v. Iron Shell*, 336 N.W.2d 372 (S.D.1983); *United States v. Heater*, 689 F.2d 783 (8th Cir. 1982); *United States v. Davis*, 657 F.2d 637 (4th Cir.1981); *United States v. Corey*, 566 F.2d 429 (2d Cir.1977). State argues that remoteness is a determination based on the totality of the circumstances. As demonstrated by the decisions noted above, a crime committed eight years before the crime charged may be too remote to be probative on issues raised at trial. However, remoteness must be considered with other factors, such as reliability and necessity, in determining probative value. The trial court must consider the nature of the offenses, the similarity of occasions and locations as well as the time elapsed between incidents. *Davis, supra* at 639.

■ State correctly points out that this evidence related to a disputed material issue in this case—intent. Titus did not deny the entry or the acts, only the intent to commit the acts. Titus claimed he was suffering from an alcohol-induced blackout on the evening of December 18th and was incapable of forming the specific intent necessary to commit burglary. Intent is one of the specific exceptions to the general rule against admissibility of prior bad acts. Titus raised the issue of intent. It was clearly a material issue at trial and the trial court so found.

Titus also claims that State failed to demonstrate a sufficient factual similarity between the 1978 crime and the current charge. In 1978, Titus entered an occupied house and took a CB radio from a closet. He was caught in the act. State argues that there are even stronger similarities between the two incidents: Titus knew the victims and had been in their homes; the two burglaries took place within the same general area of Rapid City—the area where Titus lived; in both cases, entry was gained through a back door facing the alley between Haines and Wood Avenues; Titus

was aware of periods of time when the victims were away from their homes; electronic equipment was stolen in both incidents; and both crimes were committed shortly before midnight.

In reviewing these arguments, we believe the trial court was correct in determining that the prior burglary conviction was relevant evidence. Although eight years is a considerable period of time, the prior conviction was not too remote to be probative when the factual similarities between the crimes, the reliability of the evidence, and the relevancy and necessity of the evidence are considered.

Titus next argues that even if the 1978 burglary conviction was relevant, its probative value did not substantially outweigh the danger of unfair prejudice. The unfair prejudice, according to Titus, is the belief or inference that the jury convicted him because they perceived him as a "bad person" with the propensity to commit crimes. State counters that any prejudice resulting from the admission of the prior burglary was that which resulted "from the legitimate probative force of the evidence." *See, Iron Shell, supra* at 375. State also points to the fact that the trial court gave the jury a limiting instruction as to the proper use to be made of the admitted evidence.

We agree that the admission of a prior conviction will usually result in some prejudice to the defendant. However, here the prejudice was not unfair. The trial court did not abuse its discretion in admitting evidence of the 1978 burglary conviction and in instructing the jury on the limited purpose for which the evidence was to be considered. This was a proper *case* and *use* of prior bad acts evidence.

2. SUFFICIENCY OF THE EVIDENCE TO ESTABLISH INTENT

■ The scope of appellate review on a claim of insufficient evidence to convict is "whether there is evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt." *State v. Bartlett*, 411 N.W.2d 411, 412 (S.D.1987). This court will

sustain the verdict "if the evidence and the reasonable inferences drawn therefrom sustain a rational theory of guilt. . . ." *Id.* Specifically, Titus claims that the evidence presented and the reasonable inferences drawn therefrom support his claim that he was suffering from a blackout at the time of the alleged burglary and therefore was incapable of forming specific intent. Titus points to the consistency of his statement to the police; the testimony of Cory Peters; his statements to Dr. Hess (the defense expert witness) about his long history of alcohol and drug abuse and prior blackouts; Dr. Hess' diagnosis of alcohol-dependency based upon Titus' history and MMPI test results; and Dr. Hess' testimony about alcohol-induced blackouts. Titus argues that State was unable to produce evidence that Titus was not having a blackout during the time at issue.

State argues that the credibility of witnesses and the weight accorded their testimony are exclusively the province of the jury. *State v. Logue,* 372 N.W.2d 151 (S.D. 1985). The jury chose to disregard the testimonial evidence offered to support Titus' blackout defense. State urges that the time of the burglary, the place, and method of entry form a sufficient basis for inferring intent to commit theft. State also points to evidence that Titus knew when the Frenchs would be absent from the house and that two of the stolen items (the martial arts weapons) were items in which Titus had shown a special interest as evidence impliedly refuting lack of specific intent. Dr. Hess' testimony—on the general nature of blackouts—was that a person suffering a blackout is aware of his environment at that time and would react to it in a somewhat normal manner. For example, a person in a blackout state would be able to discriminate between items of considerable versus negligible value (i.e., a VCR as opposed to tissue paper) and would be capable of recognizing a prior evaluation (i.e., that he liked or wanted a particular item). In addition, the person suffering from a blackout is capable of functioning, that is, he could drive a car, or connect a VCR to a TV. Dr. Hess also testified that a person in the blackout state has low impulse control and, after a return to "normal" consciousness, will have little or no recall of his actions or thoughts during the blackout. Dr. Hess' testimony is not refuted simply because State presented facts indicating Titus was not in a catatonic state.

Dr. Hess also stated he could not render an opinion as to whether Titus was having a blackout at the time of the alleged burglary, that only observation and evaluation at the time of the alleged blackout would provide a foundation for such an opinion. In essence, Dr. Hess' testimony was to the effect that Titus' history, statements, and other evidence were not inconsistent with a blackout. Although testimony was presented which was consistent with Titus' theory, it was for the jury to determine whether Titus was having a blackout at the time of the burglary, and, if so, whether that was sufficient to prevent his forming the specific intent. *Logue, supra.*

### 3. SUFFICIENCY OF EVIDENCE AS HABITUAL OFFENDER

■ Titus claims that testimony by State's expert was insufficient to conclude that his fingerprints were the same as those on the cards associated with other prior felonies. He also takes exception to the admissibility and sufficiency of the evidence offered by other State's witnesses.

State points out that the fingerprint expert easily found numerous points of comparison between the sets of fingerprints and concluded that it was Titus' fingerprints on all three cards. State also argues that SDCL 22–7–11 allows habitual offender to be proven by fingerprint certification and certified records of conviction. State introduced certified records of Titus' prior felony convictions. This evidence was sufficient to support the determination that Titus was the same person convicted of the prior felonies.

We affirm.

WUEST, C.J., and MORGAN and MILLER, JJ., concur.

HENDERSON, J., specially concurs.

HENDERSON, Justice (specially concurring).

Nearly ten years have gone by since I left the trial bench to serve on the appellate bench of this state. In numerous dissents, I have decried the use of prior bad acts to, in effect, establish that a person is a "bad man" and that he acted in conformity with his "bad acts." Nearly all of this effort has been in vain.* Recently, however, some writings in this Court have caused me to have a glimmer of hope that perhaps it would be recognized, one day, that evidence of crimes where acts other than ones with which an accused is charged, are generally inadmissible. There is no use flailing the decided cases. If the worm turns, someday, hooray. Today, I simply wish to state, once again, the general rule and its exceptions (as the worm is not turning but burrows steadfastly on its way), per SDCL 19-12-5:

> Evidence of other crimes, wrongs, or acts *is not admissible* to prove the character of a person in order to show that he acted in conformity therewith. *It may, however, be admissible for other purposes,* such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. (Emphasis added.)

Did his Honor, at the trial court level, commit error, not just in this case, but in any given case, when evidence of a crime or act other than the one with which the accused is charged, was admitted in evidence? The rule is that we on this Court shall determine if the trial court abused its discretion in admitting the evidence. There are many decisions pertaining to this subject, decided by this Court, so I shall just cite one, *State v. Dokken*, 385 N.W.2d 493, 497 (S.D.1986). A special concurrence by this author in *Dokken, id.* at 505, specifically cited *Chief Eagle*, and decried use of extrinsic evidence to prove specific acts. In essence, a court should exclude extrinsic

evidence of specific acts. *Accord: State v. Padgett*, 291 N.W.2d 796 (S.D.1980), and Fed.R.Evid. 608(b). The trial court did not, in the case before us, go into the deep facts of another burglary.

This Court has considered "remoteness" in *State v. Means*, 363 N.W.2d 565 (S.D. 1985) (Henderson, J., concurring in result without writing); *State v. Wedemann*, 339 N.W.2d 112 (S.D.1983) (Henderson, J., dissenting); *State v. Iron Shell*, 336 N.W.2d 372 (S.D.1983) (Henderson, J., dissenting); *State v. Pedde*, 334 N.W.2d 41, 43 (S.D. 1983); and *State v. Johnson*, 316 N.W.2d 652, 654 (S.D.1982). As it can be gleaned, the bad act worm was tunneling for the State. A prior bad act, if too remote, loses its relevancy and should be disregarded. *Wedemann*, 339 N.W.2d at 115. However, each case depends upon its own particular facts as to a limitation, regarding vintage, on the remoteness. Admission of prior acts must realistically depend upon their nature. *Wedemann*, 339 N.W.2d at 115.

Here, the trial judge opened his mind, so to speak, on the record, on June 29, 1987, for he stated he had reviewed the parties' briefs and the files and the evidentiary showing. Also, he stated he had weighed the prejudicial impact against probative value. But, most importantly, he stated that he would allow the admission of the nine-year-old burglary conviction because of its bearing (probative value) on the issue of intent and/or diminished capacity. Cardinal to his thinking: The facts and circumstances were strikingly similar and he was well aware that the defense would focus on the lack of specific intent. Also, the trial judge limited the admission into evidence of this burglary conviction and its date without the attending circumstances. Thus, though the reader of this appellate opinion obtains the facts of both burglaries, as I read over this case, the jury was not presented the particulars. His Honor, at

---

* A typical example would be *State v. Chief Eagle*, 377 N.W.2d 141, 146 (S.D.1985) (Henderson, J., dissenting), wherein I attacked persuasion by illegitimate means. J. Weinstein & M. Berger, 3 *Weinstein's Evidence*, ¶ 608[05] (1982). In *Chief Eagle*, I stated: "A man should not be convicted because he is a 'bad man'; or, that previously he acted as a 'bad man' in a given factual situation for, if convictions were secured in such fashion, the principle that a man may be punished only for those acts with which he was charged, would be violated." *Id.* at 147–48.

trial court level, ameliorated prejudicial impact.

A blackout was a tendered defense. Alcohol-induced blackout was advocated as a defense to the preclusion of specific intent. The trial judge knew this when he ruled because the State's Attorney for Pennington County filed a Notice of Prior Bad Act and appellant filed a brief in opposition thereto. Without benefit of compromising my previous dissents, therefore, because of the burglaries being committed in the same area of the same city in the same manner by the same defendant, I can join the admissibility of the prior burglary conviction and agree with the other legal discourse of the majority opinion. Here, the bad act worm tunneled into the statutory exception and reposes in the nest of intent.